VORYS, SATER, SEYMOUR AND PEASE LLP
Shane T. Micheil (SBN 312460)
   stmicheil@vorys.com
4675 MacArthur Court, Suite 700
Newport Beach, California 92660
Telephone:  (949) 531-4493
Facsimile:  (949) 531-4493

Attorneys for Plaintiffs SAKURA
COLOR PRODUCTS OF AMERICA,
INC. and SAKURA COLOR PRODUCTS
CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAKURA COLOR PRODUCTS OF AMERICA, INC. d/b/a SAKURA OF AMERICA, a California corporation, and SAKURA COLOR PRODUCTS CORPORATION, a Japanese corporation,<br><br>Plaintiffs,<br><br>v.<br><br>SUPPLIES PLS LLC, a New York limited liability company, LEIB LEFKOWITZ, a natural person, and JOHN DOES 1-10,<br><br>Defendants. | Case No:<br><br>**COMPLAINT FOR INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C § 1114; 15 U.S.C. § 1125(a); INTENTIONAL INTERFERENCE AND RELATED CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Sakura Color Products of America, Inc. d/b/a Sakura of America ("Sakura" or "Plaintiff") brings this action against Defendants Supplies Pls LLC ("Supplies Pls"), Leib Lefkowitz ("Lefkowitz"), and John Does 1-10 (collectively "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A); false advertising in violation of 15 U.S.C. § 1125(a)(1)(B); common law trademark infringement; unfair competition in violation of Cal. Bus. and Prof. Code § 17200; and intentional interference with contractual relations. These claims arise from Defendants' misappropriation of Plaintiffs' trademarks in connection with Defendants'

unlawful and unauthorized sale of materially different and non-genuine products bearing Plaintiffs' trademarks on the Internet to unwitting customers. In support of their complaint, Plaintiffs allege as follows:

**PARTIES**

1.     Sakura Color Products of America, Inc. d/b/a Sakura of America ("Sakura") is a California corporation with its principal place of business in Hayward, California.

2.     Sakura Color Products Corporation ("Sakura Japan") is a Japanese corporation with its principal place of business in Osaka, Japan. Sakura Japan is the parent corporation of Sakura.

3.     Supplies Pls LLC is a limited liability company organized under the laws of New York. According to corporate documents filed with the New York Secretary of State, the principal place of business of Supplies Pls is located at 99 Washington Ave., Ste. 1008, Albany, NY 12210. Supplies Pls operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "Supplies Plus" (the "Amazon Storefront"). The Storefront can be accessed at https://www.amazon.com/sp?seller=A17U61874I811Z. Supplies Pls does business throughout the United States through the Amazon Storefront, including in California.

4.     Leib Lefkowitz is a natural person who, upon information and belief, resides at 21 Dorset Road, Spring Valley, NY 10977 (the "Dorset Road Address") and may be served with process therein or wherever he may be found. Lefkowitz operates or assists in the operation of the "Supplies Plus" Amazon Storefront. Lefkowitz does business throughout the United States through the "Supplies Plus" storefront, including in California.

5.     The Amazon Storefront publicly displays its "Business Name" as "SUPPLIES PLS LLC" and its "Business Address" as "99 Washington Ave., Ste. 1008, Albany, NY 12210, US" (the "Washington Ave. Address"). However, this is the address for a company that provides registered agent and corporate record filing services, and clearly not the principal place of business for Supplies Pls or the residence for Lefkowitz.

6.      Storefront operators on Amazon can change the Business Name and Address that appears on the storefront.  Although Defendants currently list Supplies Pls and the Washington Ave. Address on the Storefront, they have previously listed the Dorset Road Address, which is Lefkowitz's residence, as the Business Address.

7.      Additionally, through the course of Plaintiffs' investigation, Amazon disclosed to Plaintiffs the contact information that the operators of the "Supplies Plus" Storefront provided to Amazon: Leib Lefkowitz, suppliessale@gmail.com, 99 Washington Ave., Ste. 1008, Albany, NY, US 12210.

8.      Based on this information, Lefkowitz is a corporate officer of Supplies Pls but has intentionally concealed his identity from the public by refusing to list his name on any corporate records or on the Secretary of State's website and instead using the names of companies providing registered agent or incorporation services.  But Lefkowitz was required by Amazon to provide accurate contact information to Amazon at which it could contact him about the Storefront.

9.      Sakura asserts claims against Lefkowitz in his individual capacity and also in his capacity as a corporate officer of Supplies Pls.  Upon information and belief, Lefkowitz in his individual capacity and Supplies Pls both assist in and are responsible for the operation of the Amazon Storefront.

10.     Alternatively, Lefkowitz directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Sakura's trademarks by Supplies Pls.  Accordingly, Lefkowitz is personally liable for infringing activities carried out by Supplies Pls without regard to piercing the corporate veil.

11.     Alternatively, upon information and belief, Supplies Pls follows so few corporate formalities and is so dominated by Lefkowitz that it is merely an alter ego of Lefkowitz.  Accordingly, Sakura is entitled to pierce the corporate veil of Supplies Pls and hold Lefkowitz personally liable for the infringing activities of Supplies Pls.

12.     Sakura believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the

dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Sakura. Therefore, Sakura sues these defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, Sakura will seek leave to amend this Complaint accordingly. If Sakura does not identify any such parties, it will dismiss these defendants from this action.

## **JURISDICTION**

13. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), and Plaintiffs' claims arising under the laws of the State of California are substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

14. This Court has personal jurisdiction over Defendants because Defendants have expressly aimed tortious activities toward the State of California and established sufficient minimum contacts with California by, among other things, advertising and selling infringing products bearing Plaintiffs' trademarks to consumers within California through a highly interactive commercial website, through the regular course of business, with knowledge that Sakura is located in California and is harmed in California as a result of Defendants' sales of infringing products bearing Plaintiffs' trademarks to California residents. Defendants have known that Sakura is located in California, among other reasons, because Lefkowitz received cease-and-desist letter that informed him that Sakura is located in California and is harmed in California by Defendants' sales of infringing products. Plaintiffs' claims arise out of Defendants' sales of infringing products bearing Plaintiffs' trademarks to California residents through the regular course of business.

## VENUE

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district or, in the alternative, because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Plaintiffs and Their Trademarks

16.     Sakura markets and sells high quality art and office supplies products, including products under the Sakura® brand name.

17.     Sakura allows its products to be purchased by end-user consumers in the United States only from sellers who are expressly authorized by Sakura to sell Sakura products ("Authorized Sellers").

18.     Sakura permits Authorized Sellers to sell Sakura products in approved channels only, and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Sakura Rules").

19.     Sakura devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By allowing end-user consumers to purchase Sakura products only from Authorized Sellers who are required to follow the quality controls and other requirements in the Sakura Rules, Sakura ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of the Sakura brands.  In the highly competitive art and office supplies market, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

20.     To promote and protect the Sakura brands, Sakura Japan has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: Sakura® (U.S. Reg. No. 5,496,496); Pigma Color Technologies® (U.S. Reg. Nos. 5,429,860 and 5,349,753); Gelly Roll® (U.S. Reg. No. 2,885,594); Micron®

(U.S. Reg. No. 2,417,725); Cray-Pas® (U.S. Reg. No. 0,645,760); Souffle® (U.S. Reg. No. 3,136,859); and Glaze® (U.S. Reg. No. 3,127,308) (collectively, the "Sakura Trademarks").

21.    Sakura is the exclusive licensee of the Sakura Trademarks.

22.    The registration for each of the Sakura Trademarks is valid, subsisting, and in full force and effect.

23.    Sakura actively uses, advertises, and markets the Sakura Trademarks in commerce.

24.    Consumers recognize the Sakura Trademarks as being associated with high-quality art and office supplies products.

25.    Due to the quality and exclusive distribution of Sakura's products, and because Sakura is recognized as the source of high-quality products, the Sakura Trademarks have enormous value.

**Online Marketplaces and the Threat They Pose to Plaintiffs'
Quality Controls, Reputation, and Goodwill**

26.    E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.7%.  *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 17, 2023), https://fred.stlouisfed.org/series/ECOMPCTSA.

27.    In 2022 consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021.  *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360 (February 17, 2023), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

28.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

29.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

30.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

31.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See*

Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

32.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers and their pets—particularly when, as here, a brand owner's products are injected into and ingested by pets.

33.     The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

34.     When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

35.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

36.     When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much

more likely to associate the problem with the brand/manufacturer rather than the product seller.

37.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products:  online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

38.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

39.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family.  Jamie Pitman, *Local Consumer Review Survey 2022*, BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.     The mere presence of reviews on an online product page can also increase conversion by up to 270% when compared to product pages that do not display reviews.  Tom Collinger, *How Online Reviews Influence Sales*, NORTHWESTERN UNIVERSITY, https://spiegel.medill.northwestern.edu/how-online-reviews-influence-sales/.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019,  https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

40.     Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018  https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html.     According to one study, 85% consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018,  https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

41.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.  For all of these reasons, negative online reviews can be the death knell for a manufacturer's online product listings.

**Plaintiffs' Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written by Consumers Who Purchased Poor Quality Products from Unauthorized Sellers on Online Marketplaces**

42.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products and leave negative reviews on product listings. These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

43.     Numerous consumers have written negative reviews of Sakura products being offered for unauthorized sale on Amazon.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have

1    complained of receiving products that were dried up, unusable, defective, and otherwise

2    poor-quality.

3        44.    For example, Defendants have sold the Sakura product seen in the

4    screenshot below:



15       45.    As seen in the following screenshots, numerous consumers have left

16   negative reviews of this product complaining of receiving products that were not in their

17   original packaging, not as advertised (and therefore could not be used as a gift), used,

18   leaking ink, poorly packaged, dried up, and defective:





Morgan Funk

★☆☆☆☆ **Not as described**

Reviewed in the United States us on April 26, 2023

This was a little gift and this photo shows how it was delivered. There was no packaging. Very unhappy with this product as it was not as advertised at all.

Images in this review















46.    Below is a screenshot of another Sakura product that Defendants have sold through their "Supplies Plus" Amazon storefront:



47.     As seen in the following screenshots, numerous consumers have left negative reviews of this product complaining of receiving products that were dried, used, and defective:











48.     Below is a screenshot of another Sakura product that Defendants have sold through their "Supplies Plus" Amazon storefront:



49.     As seen in the following screenshots, numerous consumers have left negative reviews of this product complaining of receiving products that were dried out, unusable, or defective:







50.     Below is a screenshot of another Sakura product that Defendants have sold through his "Supplies Plus" Amazon storefront:



51.     As seen in the following screenshots, numerous consumers have left negative reviews of this product complaining of receiving products that were dried and ineffective:



52.     Below is a screenshot of another Sakura product that Defendants have sold through their "Supplies Plus" Amazon storefront:



53.     As seen in the following screenshots, numerous consumers have left negative reviews of this product complaining of receiving products that were defective and came in tampered-with packaging:



54.     The foregoing reviews are only a small sample of the negative reviews of the products depicted above and of other Sakura products listed for sale on the Amazon

website that Defendants sell or have sold through their "Supplies Plus" Amazon Storefront.

55.    Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review.  Given that (i) Defendants have sold an extremely high volume of products bearing the Sakura Trademarks on Amazon and are not subject to Plaintiffs' quality controls, and (ii) Defendants have sold products that are not in original packaging despite being advertised as "new," that have the wrong colors of pens in the package, and have some of the other defects as in the reviews above (*see infra* ¶¶ 106-113, 130-133), it is likely that some of the foregoing negative reviews—and many other similar, negative reviews of Sakura products that appear on the Amazon website—were written by customers who purchased products bearing the Sakura Trademarks from Defendants.

**Sakura Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Caused By Online Marketplaces and Ensure Customers Receive the Genuine, High Quality Products They Expect From Sakura**

56.    The above reviews show how sales of poor quality Sakura products disappoint Sakura's consumers and cause significant harm to the reputation and goodwill of Sakura and its brands.  To protect itself and consumers from these harms, Sakura implemented a quality control program that applies to all of its Authorized Sellers as well as to all products that Sakura itself sells to consumers.

57.    Sakura's distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the Sakura Trademarks by unauthorized sellers like Defendants who do not abide by Sakura's quality controls.  The goal of Sakura's quality control program is to ensure that consumers who buy Sakura products, including ones buying online, receive the high-quality products and services that they expect with the Sakura name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the

Sakura brand.

58.     Sakura abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

59.     Sakura's ability to exercise its quality controls is essential to the integrity and quality of Sakura products, as well as the value of the Sakura Trademarks and other intellectual property.

**Authorized Sellers May Sell Sakura Products Only Through Specific Channels and Must Adhere to Sakura's Quality Control and Customer Service Requirements**

60.     Sakura maintains strict quality controls over Sakura products by allowing Sakura products to be purchased by end-user consumers only from Sakura itself or from Authorized Sellers.  Sakura's Authorized Sellers include "Authorized Distributors" and "Authorized Retailers."

61.     All of Sakura's Authorized Sellers are permitted to sell Sakura products only in certain channels and are required to abide by the Sakura Rules.  Thus, every Authorized Seller that sells Sakura products is subject to Sakura's quality control requirements.

62.     The Sakura Rules require Authorized Sellers to purchase Sakura products only from Sakura directly or from other Authorized Sellers, per the applicable policy. This restriction ensures that the chain of custody can be established for all Sakura products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low quality products from entering into the distribution chain.

63.     The Sakura Rules also limit to whom and where Authorized Sellers may sell Sakura products.  To prevent persons outside of Sakura's quality controls from acquiring and reselling Sakura products, the Sakura Rules prohibit Authorized Sellers from selling Sakura products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are permitted to sell Sakura products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

64.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also permitted to sell products Sakura products online only on websites that they themselves own and operate.  Authorized Sellers are prohibited from selling Sakura products on any other website—including on any online marketplace website—unless they first apply for and receive written approval from Sakura.

65.     These restrictions are essential to Sakura's ability to exercise its quality controls over Sakura products because they prevent unauthorized sellers from obtaining and reselling Sakura products and allow Sakura to know where all of its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Sakura can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Sakura is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

66.     In addition to restricting where and how Authorized Sellers can sell Sakura products, the Sakura Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Sakura products.

67.     To ensure that customers receive the genuine and high quality products they expect from Sakura, the Sakura Rules require Authorized Sellers to inspect all Sakura products for any damage, defects, broken seals, evidence of tampering, and other non-conformance and remove all such products from their inventory.  Authorized Sellers are prohibited from selling damaged or defective products and are required to report any discovered defects to Sakura to assist it with identifying any product quality issues.

68.     The Sakura Rules also require that Authorized Sellers store Sakura products in accordance with their labeled requirements and other further guidelines issued by Sakura.  These requirements help ensure that Sakura products are stored properly and are not damaged prior to being shipped to the consumer.

69.     To avoid consumer confusion and ensure that customers receive genuine Sakura products, Authorized Sellers must sell Sakura products in their original packaging

and are prohibited from relabeling, repackaging, diluting, or altering Sakura products or any accompanying label, literature, or safety-related information without Sakura's consent. Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

70.    Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Sakura products, including any serial number, UPC code, or other identifying information.

71.    Additionally, to ensure the quality of Sakura products when they arrive to consumers, certain genuine, new Sakura products come with a small protective ball on the tip of the pen that end-users remove upon first use.

72.    The Sakura Rules give Sakura the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Sakura products, to ensure their compliance with Sakura's quality control requirements. During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of their sources of all Sakura products. If Sakura discovers that an Authorized Seller is failing to follow the Sakura Rules, Sakura has the right to cease selling its products to the Authorized Seller and to suspend or terminate its status as an Authorized Seller of Sakura products.

73.    Authorized Sellers must also communicate all safety information to consumers and cooperate with Sakura with respect to any product recall or other consumer safety information dissemination effort conducted by Sakura regarding Sakura products.

74.    The Sakura Rules also require Authorized Sellers to provide various customer services to their customers. For example, Authorized Sellers must familiarize themselves with the features of all Sakura products kept in their inventory so they can advise customers on the selection and safe use of Sakura products. Authorized Sellers must also report to Sakura any customer complaint regarding a Sakura product, assist

Sakura in investigating any such complaint, and help customers themselves contact Sakura's customer service if needed.

75.     Sakura's quality control and customer service requirements are legitimate and substantial and have been implemented so that Sakura can control the quality of goods manufactured and sold under the Sakura Trademarks, to protect consumers as well as the value and goodwill associated with the Sakura Trademarks.

76.     Sakura's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Sakura product they were considering buying was being sold by an Authorized Seller who is subject to Sakura's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Sakura's quality controls and over whom Sakura is unable to exercise its quality controls.

**Given the Flood of Poor Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Sakura Imposes Additional Requirements on Its Authorized Sellers Who Sell Online**

77.     As shown in consumer reviews cited above (¶¶ 42-55), Sakura products sold online are more susceptible to quality and authenticity problems as consumers cannot see, touch, or inspect the product before they buy it.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

78.     Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Sakura imposes additional quality control requirements on all of its Authorized Sellers who sell Sakura products online.

79.     The Sakura Rules allow Authorized Sellers to sell Sakura products to end-user consumers online only through "Permissible Public Websites."  These rules allow Sakura to oversee all Authorized Resellers who sell Sakura products online.

80.    A "Permissible Public Website" is a website that: (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name; (2) is not a third-party storefront on an online marketplace website; and (3) lists the Authorized Seller's mailing address, telephone number, and email address.

81.    Authorized Sellers must notify Sakura before they can sell Sakura Products on a Permissible Public Website.

82.    Authorized Sellers must receive prior written approval from Sakura before they can sell Sakura products on any website that does not meet the criteria of a Permissible Public Website.  To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Sakura products, and list the specific websites where they wish to sell products. Applicants then undergo substantial vetting by Sakura that includes review of an applicant's business operating record and online review history.  A website that Sakura permits an Authorized Seller to use through this process is called an "Authorized Website."

83.    Online marketplaces, including Amazon, do not quality as "Permissible Public Websites" because they are operated by third parties rather than any Authorized Seller.  Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Sakura and specifically approved to sell on an online marketplace.

84.    The Sakura Rules impose numerous additional requirements on Authorized Sellers who sell Sakura products on Permissible Public Websites or Authorized Websites (collectively, "Authorized Online Sellers").

85.    For example, Authorized Online Sellers must use images of Sakura products provided or approved by Sakura and keep product descriptions, including images, up to date.  Authorized Online Sellers are also prohibited from advertising any Sakura product they do not carry in inventory.

86.    The Sakura Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Sakura or another third party.   These requirements allow consumers of Sakura products to understand the nature of the seller from whom they are purchasing and contact the seller if any quality issues arise.   These requirements also allow Sakura to protect the public from the sale of poor quality and counterfeit Sakura products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

87.    Authorized Online Sellers who sell Sakura products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Sakura.   At Sakura's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Sakura products.

88.    At Sakura's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Resellers are selling Sakura products.

89.    Authorized Online Sellers are prohibited from representing or advertising any Sakura product as "new" that has been returned, repackaged, or otherwise been altered by a customer.  When customers return products that were purchased online, many websites and online marketplaces will, by default, repackage the products and allow them to be relisted as "new."   The Sakura Rules prohibit Authorized Online Sellers from allowing or carrying out this practice to ensure that customers receive the high-quality Sakura products they expect when they purchase "new" products.

90.    Unless otherwise approved by Sakura, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Sakura products.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive Sakura products from other

sellers' product stock when they purchase from Authorized Online Sellers. These requirements ensure that the specific products that the Authorized Online Seller has that meet Sakura's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Sakura's quality controls.

91.     All websites through which Authorized Online Sellers sell Sakura products must comply with all applicable data security, accessibility, and privacy requirements.

92.     All websites where Authorized Online Sellers sell Sakura products must have a mechanism for receiving customer feedback, and Authorized Online sellers must take appropriate steps to address any feedback received. Authorized Online sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online sellers' products and their responses; (ii) provide this information to Sakura upon request; and (iii) cooperate with Sakura in investigating negative online reviews related to sales of Sakura products.

93.     The additional quality control requirements that Sakura imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Sakura to carefully control the quality of Sakura products that are sold online and quickly address any quality issues that arise.

94.     Sakura's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Sakura products online and on Amazon receive genuine, high-quality Sakura products that abide by Sakura's quality controls. Consumers purchasing Sakura products online and on Amazon would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, Sakura's quality controls.

**Sakura Monitors and Audits its Authorized Online Sellers To Ensure They Comply with its Quality Control Requirements**

95.    Sakura regularly audits its Authorized Online Sellers and monitors Authorized Websites and Permissible Public Websites to ensure that Authorized Online Sellers are adhering to Sakura's quality control requirements.  Sakura carries out its auditing and monitoring actions pursuant to an internal program called the Sakura Online Quality Control Program ("Auditing Program").

96.    As part of its Auditing Program, Sakura examines a rotating sample of Authorized Websites and Permissible Public Websites each month to ensure that the Authorized Online Sellers who sell through the websites are complying with the Sakura Rules.  During these examinations, Sakura checks to make sure that, among other requirements, Authorized Websites and Permissible Public Websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Sakura or a third party; (iii) do not display any content that could be detrimental to the Sakura brands; (iv) do not make any representations regarding Sakura products that are misleading; (v) exclusively contain images of Sakura products and product descriptions that are supplied or authorized by Sakura and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

97.    Sakura also periodically inspects online reviews of Sakura products and Authorized Online Sellers that appear on Authorized Websites and Permissible Public Websites.  If Sakura discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Sakura products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Sakura communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

98.    Each month, Sakura also conducts test purchases of Sakura products from a rotating sample of the Authorized Websites and the Permissible Public Websites.  If Sakura discovers any quality problems in purchased products or discovers that an

Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites and Permissible Public Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Sakura communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

99.    Through its Auditing Program, Sakura may visit the facilities of its Authorized Online Sellers to confirm that all of its quality control requirements are being followed and that Authorized Online Sellers are not selling any counterfeit Sakura products.

100.    If Sakura discovers that an Authorized Online Seller is selling Sakura products of poor quality or otherwise not adhering to Sakura's quality control or customer service requirements, Sakura conducts an investigation to determine the source of the problem.  The Sakura Rules require that Authorized Online Sellers cooperate with Sakura's investigation, permit Sakura to inspect their facilities and records relating to Sakura products, and disclose all information about where they obtained Sakura products. Based on what its investigation reveals, Sakura has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Sakura products.

**Genuine Sakura Products Come with Sakura's Satisfaction Guarantee; Defendants' Products Do Not**

101.    Sakura products purchased from Sakura's Authorized Sellers come with Sakura's 60-Day Satisfaction Guarantee (the "Guarantee").

102.    The Guarantee allows a customer who is dissatisfied with the product purchased from the Sakura website or an Authorized Reseller to return the product for a replacement or a refund within 60 days of purchase.  The complete Guarantee statement can be viewed on the Sakura of America website—*see* https://www.sakuraofamerica.com/satisfaction-guarantee/—and is incorporated herein.

103.   As discussed above, Sakura cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to Sakura's quality controls. For this reason, the Guarantee does not cover Sakura products sold by unauthorized sellers, like Defendants, who do not comply with Sakura's quality controls and standards. Indeed, the Guarantee specifically states: "Please note that because we are unable to control the quality of our products sold by unauthorized sellers, unless otherwise prohibited by law, the Sakura of America 60-Day Satisfaction Guarantee is not available for products purchased from unauthorized sellers. The Guarantee is also limited to the original, end-user purchaser."

104.   The Guarantee is a material component of genuine Sakura products. Consumers who purchase Sakura products with the Guarantee receive the peace of mind that they are receiving a good quality product, that Sakura stands behind the product, and that if a defect occurs, they will have the ability to receive a refund for the product, or to have the product replaced.

105.   Consumers would find it material and relevant to their purchasing decision to know whether a Sakura product they were considering buying was covered by the Guarantee.  If a consumer knew a product did not come with the Guarantee, the consumer would be less likely to purchase the product.

**Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Sakura Trademarks**

106.   Because the unauthorized sale of Sakura products over the Internet threatens the reputation and goodwill associated with the Sakura Trademarks, Sakura actively monitors the sale of its products online.

107.   In the course of this monitoring, Sakura discovered that high volumes of products bearing the Sakura Trademarks were being illegally sold on Amazon through a storefront called "Supplies Plus."

1
2
3

      108.   Through investigation, Sakura identified Defendants as the operators of the "Supplies Plus" storefront and the parties who are responsible for the unlawful sale of products bearing the Sakura Trademarks through the "Supplies Plus" storefront.

4
5
6
7
8

      109.   As part of its investigation, Sakura conducted several test purchases of Sakura products from the "Supplies Plus" storefront.  As an example, Sakura purchased the "SAKURA Gelly Roll Metallic Gel Pens – Pens for Scrapbook, Journals, or Drawing – Colored Metallic Ink – Medium Line – 10 Pack," shown in the screenshot below of the product listing page:

9
10
11
12
13
14
15
16
17
18



19
20
21
22

      110.   In contrast to the image of the Sakura product shown in the screenshot of the product listing above, the Sakura products that Sakura received were not packaged in the flat cardboard package shown above, but instead were bundled together and wrapped in clear plastic, as shown below:

23
24
25
26
27
28





111.   Although Sakura ordered one pack of 10 pens each of a different color, as shown in the screenshot above, it instead received an incomplete pack, with the yellow pen missing but with two gold pens:



112.   Sakura purchased several other Sakura products from Defendants.  All of the product listings for these products showed Sakura products in the original Sakura

packaging—the flat cardboard package shown above.  However, all of the products Sakura received were bundled and repackaged in clear plastic.

113.   Like the many consumers who complained of receiving repackaged and poor-quality Sakura products they purchased on Amazon and from Defendants (*supra* ¶¶ 42-55, *infra* ¶¶ 130-133), Sakura received products that were repackaged, poorly packaged, different from what it ordered, and of otherwise poor quality.

114.   Defendants are not Authorized Sellers of Sakura products are not subject to, and do not comply with, the Sakura Rules or the quality controls that Sakura imposes on its Authorized Sellers.

115.   On April 27, 2023, counsel for Sakura sent a cease-and-desist letter to Lefkowitz via overnight mail and email.  The letter explained that Sakura allows its products to be sold only by itself and by Authorized Sellers, Defendants are not Authorized Sellers, and that Authorized Sellers are regardless not permitted to sell Sakura products on Amazon unless they have the written consent of Sakura.  The letter also explained that Defendants are tortiously interfering with Sakura's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to persons or entities who are not Authorized Sellers and who resell the products.  The letter also informed Defendants that Sakura is located in California, is harmed in California as a result of Defendants' illegal sales of infringing products bearing the Sakura Trademarks, and that Defendants will be subject to personal jurisdiction in California if Sakura files suit.  Sakura's letter demanded that Defendants permanently cease selling products bearing the Sakura Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

116.   Defendants did not respond to Sakura's letter.

117.   Defendants' disregard of Sakura's cease-and-desist letter and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

118. Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Sakura Trademarks through their Amazon Storefront. Monitoring software currently estimates Defendants' 30-day sales of Sakura products at approximately 5,300 products, for revenue in excess of $65,000.

119. Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from California residents for products bearing the Sakura Trademarks and cause substantial quantities of infringing products bearing the Sakura Trademarks to be shipped to persons located in California through the regular course of business.

120. As of the time of filing, Defendants' Amazon Storefront is called "Supplies Plus." Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed. The Merchant ID number for Defendants' Amazon Storefront is A17U61874I811Z. Even if Defendants change the name of their Amazon Storefront at some time in the future, their storefront can always be accessed at the following link that includes the storefront's Merchant ID number: https://www.amazon.com/sp?seller=A17U61874I811Z.

**Defendants Are Infringing the Sakura Trademarks by Selling Products Bearing the Sakura Trademarks that Are Not Subject To, Do Not Abide By, and Interfere With Sakura's Quality Control and Customer Service Requirements**

121. Defendants are not Authorized Sellers of Sakura products, and do not abide by Sakura's quality control and customer service requirements that Sakura requires Authorized Sellers to follow.

122. Sakura's quality control and customer service requirements are legitimate and substantial. As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Sakura has lost control of the quality of goods that bear its trademarks.

123. Defendants do not abide by Sakura's quality control requirements because they sell products on Amazon. Sakura does not allow any of its Authorized Sellers to sell

Sakura products on Amazon unless they obtain Sakura's approval because of the goodwill and consumer safety issues associated with uncontrolled sales on online marketplaces discussed above. *See supra* ¶¶ 26-55.

124.   Defendants directly violate Sakura's quality controls, among many other ways, by failing to completely and accurately identify themselves on their online storefront. Defendants do not publicly display their real business name, email or physical address, or even any telephone number on their Amazon storefront.

125.   Defendants do not comply with Sakura's quality controls—and interfere with Sakura's quality controls—by repackaging Sakura products that they resell to end-user consumers and by not selling Sakura products in Sakura's original packaging.

126.   Defendants also do not comply with Sakura's quality controls—and interfere with Sakura's quality controls—because they have not disclosed to Sakura where they sell Sakura products online and have not given Sakura the right to audit and inspect Defendants' facilities and practices. Therefore, among other things, Sakura cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality products; (iii) refusing to allow products that have been returned or repackaged to be listed as "new" products; (iv) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (v) providing exceptional customer service and responding appropriately to feedback received from customers.

127.   Defendants also do not provide customer feedback to Sakura that relates to their sales of products bearing the Sakura Trademarks or cooperate with Sakura in investigating negative online reviews relating to their sales of products bearing the Sakura Trademarks, as Authorized Online Sellers are required to do. These actions prevent Sakura from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Sakura Trademarks. Sakura also cannot obtain Defendants' assistance with any recall or

consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

128.  Defendants' failure to abide by the Sakura Rules prevents Sakura from exercising control over the quality of products Defendants sell bearing the Sakura Trademarks.  Unlike with its Authorized Online Sellers, Sakura cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

129.  Because the products Defendants sell bearing the Sakura Trademarks are not subject to, do not abide by, and interfere with Sakura's quality control and customer service requirements, they are not genuine Sakura products.

**Defendants Are Selling Defective, Damaged, Previously Used, Repackaged, and Other Poor Quality Products Through Their Amazon Storefront**

130.  Consumers on Amazon can leave reviews of sellers as well as products. Reviews of Defendants' "Supplies Plus" Amazon storefront show that Defendants have sold numerous poor quality products to consumers.

131. For example, several consumers have complained about receiving inauthentic, dried up, defective, or otherwise poor-quality products bearing the Sakura Trademarks when purchasing from Defendants' Supplies Plus storefront:

★☆☆☆☆  "I did not receive the product advertised. I got 6 plastic pens wrapped in cellphone. 3 of the same tip and 3 of another tip. The pens are horrible. The plastic nibs hang up on the paper and when you press down to differentiate line thickness the nib cracks. The brush tip is way to soft to control. I'm very disappointed. I've used Sakura pens before and loved them. Either these are knock off or their products have deteriorated. "

Read less

By CD on November 11, 2022.

★★☆☆☆  "~~Product came wrapped in plastic but it was a generic box and the pens were clearly already used. Most of the ink was still there though so I kept them.~~ "

By cory b on April 13, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

1

2

★★★☆☆   "Expected them to come in a cardboard container as pictured. Instead, just rolled up and taped together. Doesn't present well as a gift. Haven't tried pens - they could be great."
Read less

3

By jean on April 20, 2023.

4

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

5

6

★☆☆☆☆   "The packaging of this item was not as pictured. This is the exact same gel pen set I've purchased previously, but this order had the pens in a white ugly box. It was supposed to be a gift but we can't gift it due to the packaging"
Read less

7

8

By Rebecca on April 18, 2023.

9

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

10

11

★☆☆☆☆   "I was sent the metallic rather than the moonlight. Very disappointed and too much hassle to send back. Would like a refund or better yet, be sent the correct order!"
Read less

12

13

By S52 on May 3, 2023.

14

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

15

16

★☆☆☆☆   "The product was not delivered in the container that was shown on your site. The pens were wrapped in clear wrap with a sticker on them. This was a gift too which made matters worse. Very disappointed."
Read less

17

18

By Morgan Funk on April 26, 2023.

19

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

20

21

22

23

24

25

26

27

28

⭐☆☆☆☆    "I've already emailed once and didn't get a reply. The pens did not come in a package. How do I know if they are used or expired? Don't advertise they are in a package if you aren't going to send them in one."

Read less

By gina fam on May 13, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

⭐⭐☆☆☆    "The pens were supposed to be 01, 03, and 05. I received two 01 pens and an 03. There was no 05 Pen."

By Alaska Annie on May 11, 2023.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

132.    Although Amazon has added comments to some of these complaints stating that Amazon takes "responsibility" for the "fulfillment experience" described in the complaints, the problems that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants.

133.    These seller reviews are evidence that Defendants ship products that are repackaged and poor-quality.   Many consumers who receive such products from Defendants may leave poor reviews of Sakura products rather than Defendants' seller performance (*see supra* ¶¶ 42-55), or become less likely to buy and recommend Sakura products in the future because they have attributed these quality problems to Sakura.

**Defendants are Infringing the Sakura Trademarks by Selling Products Bearing the Sakura Trademarks That Do Not Come With the Sakura Satisfaction Guarantee**

134.    As set forth above, genuine Sakura products purchased from Authorized Sellers who comply with Sakura's quality controls come with the Guarantee.

135.    Because Defendants are not Authorized Sellers of Sakura products and do not comply with Sakura's quality controls, the products they sell bearing the Sakura Trademarks do not come with the Guarantee.

136.   Because the products Defendants sell do not come with the Guarantee, they are materially different from genuine Sakura products.  The Guarantee is a material part of what consumers expect when they purchase Sakura products.

137.   Defendants' unauthorized sale of non-genuine products bearing the Sakura Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Sakura products that come with the Guarantee when, in fact, they are not.

**Defendants are Engaging in False Advertising by Falsely Representing That they Products They Sell Are New and In Original Packaging**

138.   In addition to infringing on the Sakura Trademarks, Defendants also falsely advertise that the products they sell are "New" and in the original packaging that genuine Sakura products are packaged in.

139.   Defendants' Amazon product listings for Sakura products state that the products are "New."  For example, Defendants are listing the following product as "New" and that shows images of the Sakura product in original packaging:

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

140.    Because consumers cannot see, touch, or inspect the Sakura products they

25  view on Amazon before purchase, it is especially important that the product descriptions

26  and images of Sakura products are accurate and up-to-date.

27
28

141.   Pursuant to Amazon's policies, a "New" product comes with the "original manufacturer's warranty and is in original packaging.

142.   Amazon's policies also require that all third-party sellers accurately describe the products they advertise and sell, including images, so that consumers can evaluate and learn about the product before purchase.  Amazon specifically requires that images accurately represent the product that is being sold.

143.   As shown above, the images of Sakura products on the product listings on which Defendants listed and sold products showed an image of Sakura products in their original packaging (¶¶ 42-55, 106-113).

144.   However, the products Defendants actually sold to consumers did not come in the original packaging and instead were opened and repackaged in clear plastic.

145.   By using images of Sakura products in their original packaging, Defendants misrepresented to Amazon consumers that the products consumers were purchasing from Defendants came in original packaging.

146.   Consumers who purchased Sakura products from these listings and received products not in the Sakura original packaging were surprised, disappointed, and confused, and posted negative reviews of Sakura products that harm Sakura's brand and reputation (¶¶ 42-55).

147.   As set forth above, the products Defendants sell do not come with the Guarantee and are not sold in original packaging.  Thus, by representing to consumers that the products they sell are "New," come with the Guarantee, and are in original packaging, Defendants are falsely advertising the products they are selling.

**Defendants Are Intentionally and Tortiously Interfering with Sakura's Agreements With Its Authorized Sellers**

148.   Upon information and belief, Defendants have purchased Sakura products from Sakura Authorized Sellers for purposes of unlawfully infringing upon and materially damaging the value of the Sakura Trademarks by reselling the products on the Internet outside of Sakura's quality controls.

149.    Sakura has entered into agreements with its Authorized Sellers that prohibit Authorized Sellers from selling Sakura products to third parties, like Defendants, who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

150.    Defendants have sold and are continuing to sell a high volume of products bearing the Sakura Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.  Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

151.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Sakura.

152.    Defendants have known that Sakura's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

153.    Defendants have known of this prohibition since, at the latest, approximately April 27, 2023.  On that date, Sakura mailed and emailed a cease-and-desist letter to Lefkowitz explaining that Sakura has agreements with all of its Authorized Sellers that prohibit them from selling Sakura products to any person or entity that is not an Authorized Seller and intends to resell the products.

154.    Sakura's letter also informed Defendants that, by purchasing Sakura products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between Sakura and its Authorized Seller and were interfering with Sakura's agreements and business relationships.

155.    Sakura's April 27 letter also advised Defendants that if they continued to acquire products from Sakura's Authorized Sellers and then resold the products, they

would be liable for tortiously interfering with Sakura's contracts and business relationships with its Authorized Sellers.

156.   Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Sakura's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

157.   In interfering with Sakura's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Sakura products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Sakura—so that Defendants could unlawfully infringe upon and materially damage the value of the Sakura Trademarks by reselling the products on the Internet, thereby committing an independent tort.

158.   Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Infringing Products Bearing the Sakura Trademarks That Defendants Are Selling Are Being Stored All Around the United States, Including in California**

159.   Individuals and entities who wish to sell products through storefronts on Amazon must enter into a contract with Amazon.com Services LLC ("Amazon.com").

160.   Once a seller has entered into a contract with Amazon.com, the seller must choose whether it will: (i) itself store and ship products; or instead (ii) pay ongoing fees to have Amazon.com store the seller's products at "fulfillment centers" (i.e., warehouses) operated by Amazon.com, and ship products to consumers once they have been purchased.  Amazon.com offers the second method of storage and fulfillment through a service called "Fulfillment By Amazon."

161.   When a seller chooses to use the "Fulfillment By Amazon" service, it retains ownership of the products it stores at Amazon fulfillment centers and can have Amazon.com ship products back to the seller before they have been purchased by customers.

162.   However, sellers who use the "Fulfillment By Amazon" are not able to control where Amazon.com stores sellers' products.  Sellers who use the "Fulfillment By Amazon" service must agree to "Fulfillment by Amazon Service Terms" set forth in their contract with Amazon.com.  These terms provide that Amazon.com can transfer sellers' products between fulfillment centers without notice or approval from sellers, although sellers are able to see—through their electronic Amazon accounts—where their products are currently being stored at any time.

163.   Amazon.com has more than 180 fulfillment centers spread around the United States, including at least one fulfillment center in almost every state. Amazon.com also promises to customers that all product orders it fulfills—including products that third-party sellers on Amazon sell to customers while using the "Fulfillment By Amazon" service—will be delivered within two days of purchase.  To live up to this promise, Amazon.com carefully distributes all products it stores for third-party sellers between its fulfillment centers, all around the country, to ensure that products can be delivered within two days of purchase no matter where in the United States they are ordered from.

164.   As a result, sellers who use Amazon.com's "Fulfillment By Amazon" service have their products stored all around the country by Amazon.com.

165.   Defendants are using Amazon.com's Fulfillment By Amazon" service for many of the infringing products bearing the Sakura Trademarks they are selling through their Supplies Plus Amazon storefront, as shown below (circled):



166.   In addition, as noted above, monitoring software shows that Defendants' 30-day sales of Sakura products are approximately 5,300 products, for revenue of approximately $65,000.  Based on these facts, along with the fact that California is a highly populous state, it is exceedingly likely that large quantities of products bearing the Sakura Trademarks owned by Defendants are being stored within California by Amazon.com before the products are purchased by residents of California.

167.   Defendants are intentionally using Amazon.com's vast, established infrastructure to sell and ship infringing products bearing the Sakura Trademarks to consumers nationwide, including customers located in California, and is paying Amazon for the privilege to do so through commissions and fees.  Defendants have not taken any steps to prevent residents of California from purchasing products bearing the Sakura Trademarks from Defendants' Amazon storefront.

**Sakura Has Suffered Substantial Harm as a Result of Defendants' Conduct**

168.   As set forth above, the unauthorized sale of products bearing the Sakura Trademarks through unauthorized sellers such as Defendants has caused significant harm to the Sakura brand.

169.   When a consumer receives a non-genuine, damaged, repackaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates

that negative experience with Sakura.  As such, Defendants' ongoing sale of non-genuine products bearing the Sakura Trademarks harms the Sakura brand.

170.   Sakura has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

171.   Sakura has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

172.   Sakura is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Sakura Trademarks, causing continued irreparable harm to Sakura's reputation, goodwill, relationships, intellectual property, and brand integrity.

173.   Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

174.   Defendants' disregard of communications from Sakura and continuation of selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

175.   Defendants' willful violations of the Sakura Trademarks and continued pattern of misconduct demonstrate intent to harm Sakura.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

176.   Sakura hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

177.   Sakura Japan is the owner of the Sakura Trademarks and Sakura is the exclusive licensee.

178.   Sakura Japan has registered the Sakura Trademarks with the United States Patent and Trademark Office.

179. The Sakura Trademarks are valid and subsisting trademarks in full force and effect.

180. Defendants willfully and knowingly used, and continue to use, the Sakura Trademarks in commerce for purposes of selling non-genuine products bearing the Sakura Trademarks on the Internet without Sakura's consent.

181. The products Defendants sell bearing the Sakura Trademarks are not authorized for sale by Sakura.

182. The products Defendants sell bearing the Sakura Trademarks are materially different from genuine Sakura products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Sakura has established.

183. Additionally, the products Defendants sell bearing the Sakura Trademarks are materially different from genuine Sakura products because they are not sold in the original Sakura packaging and, instead, are bundled and repackaged in clear plastic.

184. The products Defendants sell bearing the Sakura Trademarks also are materially different from genuine Sakura products because they do not come with the Sakura Guarantee, which accompanies genuine Sakura products.

185. Defendants' unauthorized sale of materially different products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Sakura products when they are not.

186. Defendants' unauthorized sale of materially different products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Sakura when, in fact, they are not.

187. Defendants' unauthorized use of the Sakura Trademarks has infringed upon and materially damaged the value of the Sakura Trademarks, and caused significant damage to Sakura's business relationships.

188.   As a proximate result of Defendants' actions, Sakura has suffered, and will continue to suffer immediate and irreparable harm.   Sakura has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

189.   Sakura is entitled to recover its damages caused by Defendants' infringement of the Sakura Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

190.   Sakura is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Sakura will suffer irreparable harm.

191.   Sakura is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Sakura Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

192.   Sakura hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

193.   Defendants have willfully and knowingly used, and continue to use, the Sakura Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

194.   The products bearing the Sakura Trademarks that Defendants have sold are not authorized for sale by Plaintiffs.

195.   Defendants' use of the Sakura Trademarks in connection with Defendants' unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Sakura Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs when they are not.

196.   Defendants' use of the Sakura Trademarks in connection with Defendants' sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Sakura products when they are not.

197.   Defendants' unauthorized sale of products bearing the Sakura Trademarks and unauthorized use of the Sakura Trademarks in advertising infringes on the Sakura Trademarks.

198.   Defendants' unauthorized sale of products bearing the Sakura Trademarks and unauthorized use of the Sakura Trademarks in advertising has materially damaged the value of the Sakura Trademarks and has caused significant damages to Plaintiffs' business relations.

199.   Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

200.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

201.   Sakura is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Sakura will suffer irreparable harm.

202.   Sakura is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Sakura Trademarks.

### THIRD CAUSE OF ACTION
#### False Advertising
#### 15 U.S.C. § 1125(a)(1)(B)

203.   As set forth above, Defendants are selling non-genuine products bearing the Sakura Trademarks that are materially different from genuine Sakura products.

204.   Sakura Japan is the owner of the Sakura Trademarks and Sakura is the exclusive licensee.

205. Sakura Japan has registered the Sakura Trademarks with the United States Patent and Trademark Office.

206. The Sakura Trademarks are valid and subsisting trademarks in full force and effect.

207. Through their Amazon Storefront, Defendants have willfully and knowingly used, and continue to use, the Sakura Trademarks in interstate commerce for purposes of advertising, promoting, and selling Sakura products without Sakura's consent.

208. Defendants' advertisements and promotions of their products unlawfully using the Sakura Trademarks have been disseminated to the relevant purchasing public.

209. Defendants advertise, promote, and sell products bearing the Sakura Trademarks through product listing pages on Amazon that show images of Sakura products unopened and in their original packaging.

210. Defendants advertise, promote, and sell products bearing the Sakura Trademarks and advertise the products as "New," which by definition means in original packaging.

211. Defendants actually sell products bearing the Sakura Trademarks that are not in the original packaging, but instead are opened and repackaged in clear plastic.

212. Defendants have used, and continue to use, the Sakura Trademarks to falsely advertise the products they sell, including, but not limited to, falsely advertising that the products they sell come are new and in Sakura's original packaging, as shown in the images of the Sakura products advertised on each product's product listing page on Amazon.

213. Sakura products purchased from Sakura's Authorized Sellers who comply with Sakura's quality controls are unopened and packaged in Sakura's original packaging.

214. Sakura cannot exercise its quality controls over products sold by unauthorized sellers, such as Defendants.   As such, products bearing the Sakura

Trademarks that are sold by unauthorized sellers who do not comply with Sakura's quality controls are materially different from genuine Sakura products.

215.   The products Defendants sell bearing the Sakura Trademarks are not authorized for sale by Sakura.

216.   Defendants falsely advertise that the products they sell bearing the Sakura Trademarks are new, unopened, and packaged in the original Sakura packaging.

217.   This representation is false because the products Defendants sell bearing the Sakura Trademarks are opened and packaged in clear plastic.

218.   Consumers who purchase products bearing the Sakura Trademarks from Defendants and receive opened, repackaged products in clear plastic are dissatisfied and confused, and mistakenly believe that the products they purchased are sponsored, authorized, or otherwise connected with Plaintiffs.

219.   Defendants' use of the Sakura Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Sakura Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products are genuine Sakura products when, in fact, they are not.

220.   Defendants' use of the Sakura Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Sakura products when, in fact, they are not.

221.   Defendants' use of the Sakura Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Plaintiffs when, in fact, they are not.

222.   Defendants' unauthorized use of the Sakura Trademarks in advertising, and otherwise, infringes on the Sakura Trademarks.

223.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

224.   Plaintiffs are entitled to recover its damages caused by Defendants' infringement of the Sakura Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

225.   Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Sakura Trademarks.

## FOURTH CAUSE OF ACTION
### Violation of Cal. Bus. & Prof. Code § 17200, et seq.

226.   Sakura hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

227.   This claim arises under the laws of the State of California.

228.   Sakura Japan is the owner of the Sakura Trademarks and Sakura is the exclusive licensee.

229.   Sakura Japan has registered the Sakura Trademarks with the United States Patent and Trademark Office.

230.   The Sakura Trademarks are valid and subsisting trademarks in full force and effect.

231.   Defendants have willfully and knowingly used, and continues to use, the Sakura Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

232.   The products bearing the Sakura Trademarks that Defendants have sold are not authorized for sale by Plaintiffs.

233.   Defendants' use of the Sakura Trademarks in connection with Defendants' unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Sakura Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

234.   Defendants' use of the Sakura Trademarks in connection with Defendants' sales of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Sakura products.

235.   The products sold by Defendants are not, in fact, genuine and authentic Sakura products.  The products sold by Defendants are materially different because, among other reasons, they are repackaged, are ineligible for the Guarantee, and are not subject to, do not abide by, and interfere with Sakura's quality control requirements that Authorized Sellers must follow.

236.   Defendants' obtaining of Sakura products through unlawful means and subsequent distribution or sale of the products constitutes an unfair and/or fraudulent business practice, as described in California Business and Professions Code § 17200 *et seq.*, as these actions are likely to deceive and mislead the public.

237.   As a result of Defendants' unlawful actions, Plaintiffs have suffered, and continue to suffer, irreparable harm.  Plaintiffs have also suffered, and continue to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

238.   Plaintiffs are entitled to injunctive relief under Cal. Bus. & Prof. Code § 17203 because they have no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

## FIFTH CAUSE OF ACTION
### Common Law Unfair Competition

239.   Sakura hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

240.   Defendants' unauthorized advertisement and sale of non-genuine products bearing the Sakura Trademarks interferes with Sakura's quality controls and its ability to exercise quality control over products bearing the Sakura Trademarks.

241.   Defendants' unauthorized advertisement and sale of non-genuine products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Sakura Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, Sakura's quality controls when, in fact, they are not.

242.   Defendants' unauthorized advertisement and sale of non-genuine products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Sakura Trademarks suggests that the products Defendants offer for sale are genuine Sakura products when, in fact, they are not.

243.   Defendants' unauthorized advertisement and sale of non-genuine products bearing the Sakura Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Sakura Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Sakura when, in fact, they are not.

244.   Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine Sakura products when, in fact, they are not.

245.   Defendants' unauthorized sale of products bearing the Sakura Trademarks and unauthorized use of the Sakura Trademarks in advertising infringes the Sakura Trademarks and constitutes unfair competition at common law.

246.   Defendants' unauthorized use of the Sakura Trademarks has materially damaged the value of the Sakura Trademarks, caused significant damage to Sakura's business relations, and infringed the Sakura Trademarks.

247.   As a result, Sakura has suffered, and continues to suffer, immediate and irreparable harm.  Sakura has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

248.   Sakura is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## SIXTH CAUSE OF ACTION
### Intentional Interference with Contractual Relations

249.   Sakura hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

250.   This claim arises under the laws of the State of California.

251.   Sakura has contracts and business relationships with its Authorized Sellers, who sell Sakura products.  These contracts prohibit Authorized Sellers from selling Sakura products to third parties, such as Defendants, who are not Authorized Sellers and who intend to resell the products.

252.   Defendants are not Authorized Sellers of Sakura products.

253.   Defendants have sold—and continue to sell—a high volume of products bearing the Sakura Trademarks through their Amazon storefront.

254.   Sakura has not itself sold any Sakura products to Defendants.

255.   Based on these facts, it is plausible and a reasonable inference that Defendants acquired the products they are reselling from one or more of Sakura's Authorized Sellers.

256.   Defendants have known since (at the latest) receiving Sakura's April 27 cease-and-desist letter that Sakura has agreements with all of its Authorized Sellers that

prohibit them from selling to non-Authorized Sellers who intend to resell products, and that Defendants would tortiously interfere with those agreements if they continued to acquire products from Authorized Sellers for resale.

257.   Defendants, despite having knowledge of this prohibition and without legal right, privilege, or justification, have intentionally, knowingly, and willfully interfered with the contracts and business relationships between Sakura and its Authorized Sellers by purchasing products from Authorized Sellers for the purpose of reselling them on the Internet, thereby causing Authorized Sellers to breach their contracts with Sakura.

258.   In inducing Sakura's Authorized Sellers to breach their contracts with Sakura, Defendants acted with a wrongful purpose and engaged in an independently wrongful act.  Defendants purchased Sakura products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' contracts with Sakura—so that Defendants could unlawfully infringe upon and material damage the value of the Sakura Trademarks by reselling the products on the Internet, thereby committing an independent tort.

259.   Upon information and belief, Defendants also interfered with Sakura's contracts with its Authorized Sellers through wrongful means, namely concealing and failing to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with Sakura by selling to Defendants.

260.   Sakura's contracts with its Authorized Sellers constitute a specific class of contract, even though Sakura does not yet know which specific Authorized Seller(s) will have breached their contracts with Sakura.  Sakura cannot learn this information with certainty until it is able to take discovery from Defendants in this action, but Defendants know how Defendants obtained the products Defendants have sold and are on notice of the basis for Sakura's claim of tortious interference.

261.   Defendants are not parties to the contracts Defendants caused Authorized Sellers to breach.

262.   Defendants' actions have caused Sakura to suffer, and continue to suffer, substantial injury including loss of sales and damage to its existing and potential business relations.

263.   The injury to Sakura is immediate and irreparable, as Sakura's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

264.   Sakura is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Sakura prays for relief and judgment as follows:

A.   Judgment in favor of Sakura and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.   Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)   Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Sakura Trademarks;

ii)   Prohibiting the Enjoined Parties from using any of the Sakura Trademarks in any manner, including advertising on the Internet;

iii)   Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Sakura Trademarks;

iv) Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Sakura Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v) Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Sakura's products, or any of the Sakura Trademarks;

vi) Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Sakura Trademarks which associate Sakura's products or the Sakura Trademarks with the Enjoined Parties or the Enjoined Parties' websites; and

vii) Requiring the Enjoined Parties to take all action to remove the Sakura Trademarks from the Internet, including from the website www.amazon.com.

C. An award of attorneys' fees, costs, and expenses.

D. Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Sakura demands a trial by jury on all issues so triable.

DATED:     May 26, 2023         VORYS, SATER, SEYMOUR AND PEASE LLP

1

2                    By:  /s/  *Shane T. Micheil*

                                Shane T. Micheil

3                                  Attorneys for Plaintiffs SAKURA

4                                  COLOR PRODUCTS OF AMERICA,

                                  INC. and SAKURA COLOR PRODUCTS

5                                  CORPORATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28